UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                           :

ARTEC CONSTRUCTION AND        :
DEVELOPMENT CORP.,             :
                           :

               Plaintiff,   :       15 Civ. 9494 (KPF)
                           :

              v.          :       <u>OPINION AND ORDER</u>
                           :

CITY OF NEW YORK,           :
                           :

              Defendant.  :
                           :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>November 28, 2017</u>

KATHERINE POLK FAILLA, District Judge:

     In June 2015, after a criminal investigation into its conduct, Plaintiff
Artec Construction and Development Corporation ("Artec") pleaded guilty to a
felony charge of falsifying business records. For several years prior to that
plea, Plaintiff contends, various agencies of Defendant City of New York —
including the Department of Housing Preservation and Development ("HPD")
and the Department of Investigation ("DOI") — treated Plaintiff differently from
other general contractors in the award of city-sponsored housing projects.
Plaintiff argues that this disparity in treatment amounted to an equal
protection violation, and now seeks redress pursuant to 42 U.S.C. § 1983.

     The Court briefly addressed Plaintiff's allegations when presented with
the first motion to dismiss, filed by then-Defendants HPD and DOI. In light of
Plaintiff's proposed amendments to its pleading, the Court denied that motion
and left for a later day an evaluation of the merits of Plaintiff's allegations. *See
Artec Constr. & Dev. Corp.* v. *N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 15 Civ.

9494 (KPF), 2017 WL 782911 (S.D.N.Y. Feb. 27, 2017) ("*Artec I*"). That day has come: Plaintiff filed its Second Amended Complaint on February 28, 2017, and Defendant argues, again, that Plaintiff has failed to plead a plausible constitutional violation or municipal liability for any such violation. For the reasons set forth in this Opinion, Defendant is correct, and its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is granted.

## BACKGROUND[1]

### A. Factual Background

For purposes of the instant motion, all well-pleaded allegations in the Second Amended Complaint are taken as true. Plaintiff is a contractor that builds affordable housing in New York City, in part through contracts administered by HPD. (SAC ¶ 1). Plaintiff has served as the general contractor for at least six HPD-administered projects. (*Id.* at ¶ 7).[2] Of note, these contracts are subject to the Davis-Bacon Act of 1931, which is codified at 40 U.S.C. §§ 3141-3148 and which, along with related statutes, requires contractors and subcontractors on public works projects to pay laborers the local prevailing wages (the "Prevailing Wage Laws").

In or about May 2011, the United Brotherhood of Carpenters and Joiners (the "UBC"), an influential trade union, "commenced an aggressive public

---

[1] This Opinion draws principally from the Second Amended Complaint ("SAC," Dkt. #33) and, for reasons explained below, from certain facts and documents of which judicial notice can be taken. For convenience, the Court refers to Defendant's moving brief (Dkt. #37) as "Def. Br."; to Plaintiff's brief in opposition (Dkt. #38) as "Pl. Opp."; and to Defendant's reply brief (Dkt. #39) as "Def. Reply." The Declaration of Jenna Krueger in Support of the Motion to Dismiss (Dkt. #36) is referred to as "Krueger Decl."

[2] Plaintiff does not specify when it was awarded these six contracts; Plaintiff simply says it had these contracts "[d]uring the relevant time period." (SAC ¶ 7).

information campaign against [Plaintiff] alleging that [Plaintiff] and its subcontractors failed to pay the area standard wages to their employees and violated the Prevailing Wage Laws." (SAC ¶ 9). The UBC conducted this so-called "smear campaign" through social media, the local press, and "emails and letters to government officials, power players and others involved in the New York City affordable housing industry[.]" (*Id.* at ¶¶ 10-11). A full-page ad ran in the newspaper *City Hall*, asking, "HPD: Why are you perpetuating these irresponsible contractors?" (*Id.* at ¶ 12). Similarly, the UBC accused HPD of enabling Plaintiff's wage violations by "failing to affirmatively collect certified payrolls and withhold contract payments as required by the law." (*Id.* at ¶ 11).

According to Plaintiff, these allegations gave HPD "an axe to grind with [Plaintiff]." (SAC ¶ 14). In consequence, in or about late June 2011, Doug Apple, then-First Deputy Commissioner of HPD, informed Plaintiff's owner, Chris Tsetsekas, of HPD's decision to prohibit Plaintiff from acting as general contractor on a public housing project known as the West Wind project, located at 45 East 131st Street. (*Id.* at ¶ 14). While not explicit in his reasoning, Apple intimated that the prohibition was in response to the UBC's accusations against Plaintiff and, in turn, that Plaintiff could resume working on HPD projects "[w]hen the dust settle[d]." (*Id.* at ¶ 15).

In the following months, Plaintiff made amends with the UBC, which then agreed to "fully support [Plaintiff's] efforts to get new HPD-related projects." (SAC ¶ 16). Plaintiff informed HPD about its agreement with the UBC, but by that time DOI was investigating possible violations of the

Prevailing Wage Laws by Plaintiff and its subcontractors. (*Id.* at ¶¶ 17, 20).

Plaintiff reached out to James Tierney, the DOI Inspector General, to ask for a meeting with DOI "to learn the basis of the investigation and to figure out how it could begin to take on new City-related construction projects again"; eventually, Plaintiff secured a meeting with a DOI investigator. (*Id.* at ¶¶ 21, 23). Plaintiff complains that DOI was "anything but forthcoming" and would not reveal the details of its investigation — even as it sought to question Tsetsekas about Plaintiff's oversight of subcontractors. (*Id.* at ¶ 23). DOI denied, however, that it directed HPD to reject Plaintiff's applications to work on HPD-funded projects. (*Id.*).

On September 14, 2012, HPD placed Plaintiff on "Enhanced Review status" because of Plaintiff's "$1,689,262.79 in prevailing wage violations." (SAC ¶ 24). Kimberly Hardy, HPD's Special Counsel for Regulatory Compliance, insinuated that this decision was prompted by DOI. (*Id.* at ¶ 25). And by March 2013, Plaintiff learned that DOI was working with the United States Attorney's Office for the Eastern District of New York (the "EDNY") on a criminal investigation into Plaintiff's alleged Prevailing Wage Law violations. (*Id.* at ¶ 26).

Plaintiff came to understand that the EDNY "had no interest" in bringing a case against it, and hoped that this disinterest would put an end to the investigation. (SAC ¶ 28). Instead, however, Michael Carroll, the DOI Deputy Commissioner and Chief of Investigations, teamed up with the New York County District Attorney's Office ("DANY"). (*Id.* at ¶¶ 28-29). Thereafter, DOI

demanded that Plaintiff pay the allegedly unpaid wages, require Tsetsekas to sit for a proffer session with DOI and DANY, and cooperate with DOI in future investigations of the construction industry. (*Id.*). Plaintiff refused, and now alleges that DOI "made sure [Plaintiff] would be forever barred from performing work on City-related construction projects." (*Id.* at ¶ 30).

In sum, Plaintiff alleges that Apple and Hardy of HPD, and Carroll and Tierney of DOI, were "policymakers" by virtue of their inclusion on the New York City Policymaker List that the New York City Conflicts of Interest Board issues annually pursuant to the New York City Charter. (SAC ¶¶ 31-35). Plaintiff further alleges that, in their capacity as policymakers, Apple and Hardy precluded Plaintiff from working on HPD projects and placed Plaintiff on Enhanced Review, while Carroll and Tierney singled out Plaintiff for a criminal investigation, and effected a "*de facto* debarment" from working on HPD projects. (*Id.* at ¶¶ 33-35). Specifically, Plaintiff alleges that HPD barred it from working as the general contractor on seven projects — identified as the West Wind, Cypress Hill, Sugar Hill, East Clarke Place, Alembic/Cypress, Alembic/Broadway, and West 53rd Street projects — that were collectively valued at $171,000,000. (*Id.* at ¶¶ 47-64). Plaintiff further alleges that, during the same time period, HPD permitted seven developers — Mountco Construction & Development Inc. ("Mountco"), Galaxy General Contracting ("Galaxy"), Lettire Construction Corporation ("Lettire"), Procida Construction Corporation ("Procida"), Lemle & Wolff Construction Corporation ("Lemle & Wolff"), Mega Contracting ("Mega"), and MDG Design ("MDG") — to continue

working on affordable housing projects, even though they, too, had been placed on Enhanced Review status by HPD because of suspected Prevailing Wage Law violations and had worked with the same problematic subcontractors. (*Id.* at ¶¶ 37-46). To compensate for this unequal treatment, Plaintiff seeks an award of $171,000,000. (*Id.* at ¶ 80).

## B.    Procedural Background

This case was removed from New York State Supreme Court, New York County, on December 4, 2015. (Dkt. #1). As noted above, HPD and DOI previously moved to dismiss Plaintiff's First Amended Complaint (Dkt. #22); the Court denied that motion and granted Plaintiff leave to replead, *Artec I*, 2017 WL 782911, at *5-6. Plaintiff filed its SAC on February 28, 2017 (Dkt. #33), and the parties appeared for a pre-motion conference on March 22, 2017 (*see* Dkt. #34). Defendant moved to dismiss the SAC on April 28, 2017 (Dkt. #35), Plaintiff filed its opposition on May 26, 2017 (Dkt. #38), and Defendant filed its reply in further support of its motion on June 11, 2017 (Dkt. #39).

## DISCUSSION

## A.    Applicable Law

### 1.    Motions to Dismiss Under Rule 12(b)(6)

When evaluating the sufficiency of a pleading under Rule 12(b)(6), a court must accept all well-pleaded allegations as true and must make all reasonable inferences in favor of the plaintiff. *Harris* v. *Mills*, 572 F.3d 66, 71 (2d Cir. 2009). This obligation does not apply, however, to legal conclusions couched as factual allegations. *Id.* at 72. "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen* v. *Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)). But a complaint need not meet a "probability requirement," and a plaintiff's claim can proceed even if it appears that success on the merits is unlikely. *Id.* (quoting *Iqbal*, 556 U.S. at 678)).

### 2. Consideration of Documents Outside the Pleadings

Defendant has submitted with its briefing copies of Plaintiff's Plea Agreement with DANY, dated June 16, 2015, in which Plaintiff pleaded guilty to one count of Falsifying Business Records in the First Degree, in violation of New York Penal Law § 175.10 (Krueger Decl., Ex. C); a Superior Court Information in the matter *People* v. *Artec Construction & Development Corporation*, Case No. SCI-02139-2015, dated February 2, 2016 (*id.*); and a Certificate of Disposition in the same matter, dated January 7, 2016 (*id* at Ex. D). While the Second Amended Complaint speaks at length about the unconstitutionality of the DOI and DANY criminal investigation, it omits mention of Plaintiff's concomitant plea and conviction.

Typically, when deciding a motion to dismiss, a court may consider "facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," along with documents so heavily relied upon that they are integral to the complaint. *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may

be considered in resolving a motion pursuant to Fed. R. Civ. P. 12(b)(6)). Defendant encourages the Court to take judicial notice of Plaintiff's guilty plea and conviction. (Def. Br. 6). And, indeed, a court may take judicial notice of convictions that are a matter of public record. *Shmueli* v. *City of N.Y.*, 424 F.3d 231, 233 (2d Cir. 2005). The Court thus considers the fact of Plaintiff's guilty plea and felony conviction, though it does not rely on the Plea Agreement, Superior Court Information, or Certificate of Disposition for the truth of the matters asserted therein. *Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine *what* statements they contained — but *again not for the truth of the matters asserted.*" (internal quotation marks omitted)).

### 3. The Equal Protection Clause

Plaintiff pursues two theories of violation of the Equal Protection Clause, known as "selective enforcement" and "class of one." By way of background, the Equal Protection Clause is a mandate that all state governments — including administrative agencies — treat all similarly situated people alike. *See Engquist* v. *Oregon Dep't of Agr.*, 553 U.S. 591, 597 (2008); *City of Cleburne* v. *Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [courts] have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Artec I*, 2017 WL 782911, at *2 (quoting *Harlen*

*Assocs.* v. *Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (alteration in original)).

A plaintiff who does not allege any protected class affiliation can, nonetheless, demonstrate an equal protection violation where the plaintiff shows that he or she was treated differently from similarly situated individuals in circumstances where there was no rational basis for the difference in treatment ("class of one"), or where the different treatment was based on a malicious or bad-faith intent to injure ("selective enforcement"). *See Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam) (describing "class of one" standard); *LeClair* v. *Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) (describing "selective enforcement" standard); *see generally Bizzarro* v. *Miranda*, 394 F.3d 82, 86-89 (2d Cir. 2005) (discussing both theories of liability).

With respect to a "class of one" claim, the Supreme Court has recognized "a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage [its] internal operation." *Engquist*, 553 U.S. at 598 (internal quotation marks and citation omitted) (alteration in original). This is because governmental entities must, at times, engage in "discretionary decisionmaking based on a vast array of subjective, individualized assessments" in which "treating like individuals differently is an accepted consequence of the discretion granted." *Id.* at 603. For such cases, generally speaking, equal protection claims are not viable.

9

Though *Engquist* was decided in the public employment context, the Second Circuit has recognized that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," while making clear that "*Engquist* does not bar all class-of-one claims involving discretionary state action." *Analytical Diagnostic Labs, Inc.* v. *Kusel*, 626 F.3d 135, 142 (2d Cir. 2010). As this Court noted in *Artec I*, "class of one" claims are more likely to fall within the *Engquist* bar when they challenge actions in the Government's role as a proprietor, managing its internal operations. *Artec I*, 2017 WL 782911, at *3.[3]

### 4. Municipal Liability

Finally, to hold a municipality such as Defendant liable for the alleged constitutional violations, Plaintiff "is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Wray* v. *City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista* v. *Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). This is because a municipality is only liable for actions that flow from a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell* v. *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

---

[3]  *Engquist* did not discuss claims for selective enforcement and the Second Circuit has not yet addressed the question of whether *Engquist*'s holding can be extended to such claims. *See Emmerling* v. *Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011) (summary order).

A "single act of a municipal policymaker, *i.e.*, a person with the authority to set municipal policy, can constitute official policy, and thus, can give rise to municipal liability." *Santos* v. *New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Pembaur* v. *Cincinnati*, 475 U.S. 469, 480 (1986)). Authority to set municipal policy resides in "the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (citation omitted). "[W]hether an official had final policymaking authority is a question of state law." *Id.*; *see also Fierro* v. *N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014).

## B. Analysis

### 1. Plaintiff's Suit Is Not Barred by *Heck*

Defendant first argues that to the extent Plaintiff's equal protection claims are based on the propriety of DOI's investigation, those claims amount to an attack on the validity of Plaintiff's criminal conviction, and, as such, are barred by the Supreme Court's decision in *Heck* v. *Humphrey*, 512 U.S. 477, 486-87 (1994). (Def. Br. 7). The Supreme Court in *Heck* held that a plaintiff cannot challenge a criminal conviction under § 1983 unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87. This is often called the "favorable termination" requirement. *Poventud* v. *City of N.Y.*, 750 F.3d 121, 130 (2d Cir. 2014) (*en banc*).

Neither party argues that Plaintiff's conviction has been vacated or otherwise invalidated. Plaintiff sources its claim, however, in an exception to the *Heck* bar recognized by the Second Circuit, which exception permits § 1983 claims to proceed where the plaintiff is no longer in state custody and does not have any available *habeas* remedy. (Pl. Opp. 2-3 (citing *Leather* v. *Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 1999))). *See also Huang* v. *Johnson*, 251 F.3d 65, 73-75 (2d Cir. 2001) (permitting a § 1983 claim to proceed where Plaintiff was released from custody and could not pursue *habeas* relief).

Defendant is correct that the precise contours of the *Heck* bar are not "definitively settled" in the Second Circuit, *see Teichmann* v. *New York*, 769 F.3d 821, 827-31 (2d Cir. 2014), but its related argument that *Heck* applies to convictions secured through a guilty plea is inapposite. (Def. Reply 9). It matters not how the conviction was entered; what matters for the *Heck* analysis is whether the plaintiff has any recourse in a writ of *habeas corpus*. *See, e.g., Huang*, 251 F.3d at 73-74 (declining to apply the *Heck* bar to a § 1983 action filed by a plaintiff who pleaded guilty and was no longer in custody). And although the application of *Heck* to a § 1983 claim where a *habeas* remedy is unavailable continues to cause "consternation" in this Circuit, *Teichmann*, 769 F.3d at 828 (Calabresi, J., concurring), Plaintiff's case is a clear one. Even after the *en banc* narrowing of the *Heck* bar in *Poventud*, this Circuit still recognizes an exception to the favorable termination requirement where a plaintiff, like Artec, was never in state custody, "that is, where an action under

§ 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Id.* (Livingston, J., concurring).

The Plea Agreement between Plaintiff and DANY imposed a fine; because Plaintiff is a corporate entity, Plaintiff was not sentenced to any term of imprisonment. (Krueger Decl., Ex. D). And because Plaintiff was never, and is not now, in state custody, Plaintiff could never challenge the propriety of its conviction through a petition for a writ of *habeas corpus.* Accordingly, Plaintiff may bring a claim under § 1983.

### 2. Plaintiff's Claim That the City Enacted a *De Facto* Debarment Is Timely

Claims brought under § 1983 must be made within three years of when the plaintiff "knows or has reason to know of the harm." *Eagleston* v. *Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks omitted). From this, Defendant argues that Plaintiff's claim based on an alleged *de facto* debarment from HPD projects is time-barred, insofar as it accrued before November 9, 2012 — three years before the initial complaint in this action was filed in state court. (Def. Br. 9-11). This argument, in turn, is predicated on Plaintiff's allegation in the SAC that responsibility for the alleged debarment shifted "at some unknown point in 2012" from HPD to DOI, because "HPD was no longer running the show." (SAC ¶ 34; *see also* Def. Br. 10).

Defendant's argument splits hairs. The initial Complaint in this matter named HPD and DOI as defendants, but, following the Court's February 27, 2017 Order (Dkt. #32), Plaintiff amended its pleading to name the proper entity, *i.e.*, the City of New York (Dkt. #33). Thus, for purposes of the instant

motion, the Court evaluates liability as to the City generally, rather than as to HPD or DOI individually.  As long as Plaintiff can show that its claim of a *de facto* debarment as to Defendant accrued after November 9, 2012, its § 1983 on those facts is timely.

Plaintiff argues that its claim for a *de facto* debarment did not accrue until after November 2012.  (Pl. Opp. 23-24).  In so doing, Plaintiff seizes upon Defendant's acknowledgement that "[d]enial of a single contract or project is insufficient to allege a *de facto* debarment."  (*Id.* (quoting Def. Br. 11)).  Indeed, Plaintiff alleges, by November 9, 2012, it was only aware of one HPD project — the West Wind project — from which it had been barred.  (SAC ¶ 48).  It was only in December 2012 that Plaintiff was barred from three more HPD projects — Cypress Hill, Sugar Hill, and East Clarke Place — and in early 2013 from two more — Alembic/Cypress and Alembic/Broadway.  (*Id.*).

The Court agrees with both parties that a denial of a single contract does not a *de facto* debarment make.  *See Quadrozzi Concrete Corp.* v. *City of N.Y.*, No. 03 Civ. 1905 (LAP), 2004 WL 2222164, at *7 (S.D.N.Y. Sept. 30, 2004); *Housing Works, Inc.* v. *City of N.Y.*, 680 N.Y.S.2d 487, 492 (1st Dep't 1998). Accordingly, the Court finds that Plaintiff did not know or have reason to know of the alleged *de facto* debarment until after November 9, 2012, which renders its *de facto* debarment claim timely.

### 3.     The Merits of Plaintiff's Equal Protection Claims

Plaintiff claims that Defendant treated it differently compared to similarly situated affordable housing developers because Plaintiff was (i) placed on HPD's

Enhanced Review list, (ii) subjected to a *de facto* debarment from HPD projects, and (iii) subjected to a criminal investigation. (SAC ¶¶ 33-35). In support of its equal protection claims, Plaintiff proffers evidence of seven comparable contractors — Mountco, Galaxy, Lettire, Procida, Lemle & Wolff, Mega, and MDG (together, the "Comparators") — all of which were on HPD's Enhanced Review list but were permitted to continue working on HPD affordable housing projects and were not subjected to criminal investigation or prosecution. (*Id.* at ¶¶ 38-44).

Before turning to Plaintiff's "class of one" and "selective enforcement" claims, the Court observes at the outset that Plaintiff cannot recover under either theory for its claim that placement on the HPD Enhanced Review list constituted an equal protection violation. (*See* SAC ¶ 33).[4] After all, both "class of one" and "selective enforcement" claims require proof that the plaintiff was treated differently from similarly situated comparators. *Bizzarro*, 394 F.3d at 86. Each of the seven Comparators was also placed on the Enhanced Review list, and thus was treated in the same way as Plaintiff. (SAC at ¶¶ 38-44). Accordingly, the Court limits its analysis to Plaintiff's claims that Defendant impermissibly enacted a *de facto* debarment and participated in a criminal investigation of Plaintiff.

---

[4]     The Court understands the SAC to raise a claim that Plaintiff was improperly placed on the Enhanced Review list. (SAC ¶ 33). In its briefing, Plaintiff appears to build on a passing reference in the SAC to Defendant's refusal to remove Plaintiff from the Enhanced Review list with the goal of expanding its claim to include an allegation that Defendant improperly kept Plaintiff on the Enhanced Review list. (*Id.* at ¶ 46; Pl. Opp. 9). To the extent that Plaintiff seeks to raise such a claim, the Court finds it has not been adequately pleaded in the SAC and that, even if it had, it would fail on the merits for the same reasons discussed in the text.

### a. Claims Based on a Class of One Theory

To prevail on a "class of one" claim, Plaintiff must show that it was treated differently than similarly situated comparators and that there was no rational basis for the different treatment. *Vill. of Willowbrook*, 528 U.S. at 564. Specifically, Plaintiff must establish that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in the circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Kusel*, 626 F.3d at 140 (internal quotation marks and citation omitted).

Defendant raises what the parties agree is an issue of first impression in this Circuit: whether the Supreme Court's decision in *Engquist* — which eliminated "class of one" claims for government employees — should be extended to bar claims like Plaintiff's that are raised in the government contract approval context. (Def. Br. 18-19; Pl. Opp. 12). Because the degree and type of government discretion used is central to an analysis of whether *Engquist* bars Plaintiff's claims, the Court takes each alleged government action in turn, looking first at Plaintiff's claim that Defendant effectively barred it from working on HPD-funded projects and second at Plaintiff's allegation that Defendant impermissibly singled Plaintiff out for criminal investigation and prosecution.

###### i.     *De Facto* Debarment

Defendant argues that "when HPD approves contractors for the projects it funds, just like with procuring contactors for City contracts, it is acting only as a proprietor and manager, not as a regulator" and that, importantly, "HPD wields virtually unfettered discretion over the selection process." (Def. Br. 19). Defendant further notes that "HPD must rely upon many subjective decisions by agency experts to optimize the use of taxpayer-funded loans" and "could not function as a lender or mortgagor if every subjective assessment were subject to constitutional review." (*Id.* at 20).

In opposition, Plaintiff makes much of the Second Circuit's holding in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action." (Pl. Opp. 12 (quoting *Kusel*, 626 F.3d at 142)).  Plaintiff argues that its claim should not be barred by *Engquist* because "HPD is essentially acting as a regulator/lawmaker by adopting regulations to govern the treatment of private contractors who desire to perform work on privately negotiated contracts." (*Id.* at 13).  Moreover, Plaintiff contends, Defendant acted pursuant to a *de facto* standard in its treatment of contractors placed on Enhanced Review for suspected Prevailing Wage Law violations — a standard that permitted those developers to continue working on HPD projects — which HPD violated when it barred Plaintiff from further work.  (*Id.* at 14-15).

Because Defendant's actions were governed by this standard, they "were not discretionary enough to bar [Plaintiff's] 'class of one' claim." (*Id.* at 15).[5]

The *Engquist* Court was, at base, uneasy about imposing constitutional liability for "forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and found that this concern "applies most clearly in the employment context." *Engquist*, 553 U.S. at 603. Presumably for this reason, the Court was careful to confine its holding to that context, *id.* at 607, and provided little guidance on how it might be extended. It is not surprising, then, that Courts of Appeals have split on this question. *See Kusel*, 626 F.3d at 141-42 (describing circuit split).

While the Second Circuit conceded in *Kusel* that "there may be some circumstances where *Engquist* is properly applied outside of the employment context," it spoke disapprovingly of certain district courts' attempts to extend the *Engquist* bar. *Kusel*, 626 F.3d at 141 ("Several district courts in this

---

[5]     Plaintiff also analogizes the government action in *Kusel* — which, that Court held, was not so discretionary as to trigger the *Engquist* bar — to the decision to place Plaintiff on the HPD Enhanced Review list, and Plaintiff argues that the Court should permit that claim to proceed. (Pl. Opp. 12-13). Defendant counters that this analogy in fact misreads the opening brief, in which Defendant argues that *Engquist* bars Plaintiff's claim that Defendant impermissibly disallowed Plaintiff from working on various HPD-funded projects. (Def. Reply 5). The Court agrees, but for a different reason. As noted above, Plaintiff cannot recover on a "class of one" theory for its claim that Defendant improperly placed it on the Enhanced Review list because Plaintiff is in a class of, at least, eight. *Shatney* v. *LaPorte*, 634 F. App'x 53, 54 (2d Cir. 2016) (summary order) ("[A] plaintiff who is in a 'class of one' may bring an equal-protection claim 'where the plaintiff alleges she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" (quoting *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam))). Because the SAC alleges that Plaintiff was treated identically to the Comparators in its placement on HPD's Enhanced Review list, this allegation cannot form the basis for any recovery, and the Court will not probe Defendant's decision to place Plaintiff on Enhanced Review.

Circuit have extended *Engquist*'s holding to require that plaintiffs seeking to establish a class-of-one claim must show the difference in treatment flowed from non-discretionary action, but they have done so without persuasive analysis."). By contrast, the *Kusel* Court found the reasoning in *Alfaro* v. *Labrador* persuasive, which reasoning asked whether the government action at issue "involve[s] discretion that is actually exercised on a day-to-day basis" or if the action is "theoretically discretionary but — as a practical matter — actually depend[s] on de facto standards." *Id.* (citing *Alfaro* v. *Labrador*, No. 06 Civ. 1470 (JS), 2009 WL 2525128, at *9 (E.D.N.Y. Aug. 14, 2009)). Decisions in the latter category, both courts agreed, were more likely to survive *Engquist*. *Id.*

Defendant argues that its discretion in deciding whether to permit a contractor to work on an HPD-funded project falls into the former "day-to-day" category. HPD issues loans to fund affordable housing construction and, as part of its lending role, "manage[s] the administration of these projects in order to ensure the quality of this public service." (Def. Br. 19). One way in which Defendant "manages" this process is by "approving contractors for private contracts receiving loans." (*Id.*).

Defendant may select a contractor for an HPD-funded project by "any method permitted by Law which [HPD] determines will best meet the Project's objectives and the City Housing Goals, including, but not limited to, direct negotiation, [Requests for Qualifications], [Requests for Proposals], competitive bidding, public bidding, auction, selection by entities other than [HPD], and application." 28 R.C.N.Y. § 33-03(a). And, as Defendant notes, HPD can

"disapprove any contractor or subcontractor because of previous violations of statutes, rules or regulations relating to discrimination, standards of employment or labor standards, or because of inefficiency, abandonment of duties, or disregard for creditors on prior jobs performed under this Program or other programs of the City." *Id.* § 2-06(a)(3). (*See* Def. Br. 20). The Rules further provide that HPD "may reject any Applicant ... at any time and for any reason" including if HPD determines "at any time that good and sufficient reasons exist why the City should not do business with an Applicant ... or should not allow such Applicant ... to act as Sponsor for a Project," while making clear that the "Rules are not intended to confer rights or benefits upon the general public or upon any individual or entity." *Id.* §§ 33-08(a)(1), 33-08(d).[6] Finally, HPD retains the right to pull funding or change the Sponsor of a project "at any time prior to the execution of a Binding Agreement." *Id.* § 33-08(e).

Defendant's discretion to approve applicants for HPD-funded projects is, thus, nearly unfettered. More to the point, HPD's power to choose which contractors will work on its projects is far more discretionary than the process that gave the Second Circuit pause in *Kusel*. There, a clinical testing lab

---

[6] "Applicant" is defined as "any potential Sponsor of a Project, without regard to the method used by the Agency to select the Sponsor for such Project, including, but not limited to, any person or entity which has submitted or might potentially submit a qualification statement, proposal, bid, application, or other submission." 28 R.C.N.Y. § 33-01(a)(4).

"Sponsor" is defined as "an Applicant or Selected Applicant, or an entity formed by an Applicant or Selected Applicant and approved by the Agency, which has executed one or more Binding Agreement(s) with the Agency." 28 R.C.N.Y. § 33-01(a)(31).

complained that the New York State Department of Health ("DOH") subjected it to "an intense and unwarranted degree of regulatory scrutiny." *Kusel*, 626 F.3d at 137. DOH investigated the lab numerous times over a period of several years and "refused to renew [its] operating permit." *Id.* at 138. Critical to the Court's analysis was the fact that "DOH [did] not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license"; DOH could not revoke a license without a hearing, and the decision could be challenged in an Article 78 proceeding. *Id.* at 142; *see* N.Y. C.P.L.R. § 7801. In sharp contrast, HPD possesses the ability to choose contractors through whatever process it deems best and can elect not to work with a contractor if it determines, in its discretion, that the City should not do business with that entity. The Rules of the City of New York do not require HPD to explain its choices, do not grant contractors the right to a given project, and do not afford due process in the event of a rejection or removal. *See generally* 28 R.C.N.Y. §§ 33-03, 33-08. Plainly, Defendant has broad discretion to approve or disapprove an applicant for an HPD-funded project.

Significantly, however, the analysis does not end there. As Judge Seybert noted in *Alfaro* — and as the Second Circuit found instructive in *Kusel* — government decisionmaking that is "theoretically discretionary" can "as a practical matter [] actually depend on *de facto* standards." *Alfaro*, 2009 WL 2525128, at *9; *see also Kusel*, 626 F.3d at 141. For purposes of this motion, the Court must accept as true Plaintiff's allegation that Defendant employed what was, effectively, a "consistent pattern and practice" of allowing

contractors on the Enhanced Review list to continue to work on HPD-funded projects. *Alfaro*, 2009 WL 2525128, at *9. (*See* SAC ¶¶ 38-44; Pl. Opp. 15). And where the government acts pursuant to a standard, even where it is not obligated to do so, its decisionmaking implicates the equal protection obligation to treat "all persons similarly situated … alike." *City of Cleburne*, 473 U.S. at 439.

In light of Plaintiff's policy allegations and the Second Circuit's decision in *Kusel*, the Court must conclude at this stage of the litigation that the decisionmaking process at issue is not so discretionary as to trigger the *Engquist* bar. Accordingly, the Court may consider the merits of Plaintiff's claim that Defendant's *de facto* debarment put Plaintiff in an impermissible "class of one." But while Plaintiff overcomes this first hurdle, it falls at the second.

On the facts alleged in the SAC, the Court cannot find a basis for a "class of one" claim regarding Defendant's *de facto* debarment. To be sure, the SAC pleads sufficient facts to show that Plaintiff was the only one of the Comparators to be denied participation in HPD-funded projects while being on Enhanced Review for suspected Prevailing Wage Law violations. (*See* SAC ¶¶ 37-44). But also according to the SAC, none of the Comparators was being investigated for possible criminal conduct. (*See id.*). Given this rather significant difference, the Court cannot say that Plaintiff alleges the "extremely high degree of similarity" between Plaintiff and the Comparators that is

required to prevail on a "class of one" claim. *Clubside, Inc.* v. *Valentin*, 468 F.3d 144,159 (2d Cir. 2006).

Even assuming, for purposes of this motion, that Plaintiff were sufficiently situated to the Comparators, its claim still fails because it cannot prove that there is no rational basis for Defendant's actions. Plaintiff asserts that Defendant's actions were "irrational" (SAC ¶ 77), but the Court does not agree.[7] As Defendant notes, its decision to deny Plaintiff work on HPD-funded contracts was reasonably related to a legitimate government interest in ensuring that "workers on HPD projects receive prevailing wages." (Def. Br. 21). Plaintiff concedes Defendant's interest in enforcing fair wage laws, but claims nonetheless that there was no rational basis to bar Plaintiff from HPD-funded contracts while allowing other contractors that were suspected of similar violations, because "there is nothing here to suggest that [Plaintiff's] alleged prevailing wage violations were more severe than the Comparators['][.]" (Pl. Opp. 11). But, of course, there was reason to single out Plaintiff: According to the SAC, none of the Comparators was being investigated by DOI — first with the EDNY and subsequently with DANY — for possible criminal conduct. (SAC ¶¶ 26, 28-29, 38-44).

Plaintiff lost its first HPD contract in June 2011, lost three more in December 2012, and lost two more in early 2013. (SAC ¶¶ 51, 53, 55, 57, 59, 61). Plaintiff became aware of DOI's investigation in January 2012 (*id.* at ¶ 20),

---

[7]     Several of the parties' rational basis arguments center on the propriety of Plaintiff's placement on the Enhanced Review list. (Def Br. 20-21; Pl. Opp. 8-9). As noted throughout this Opinion, the Court will not consider these arguments.

and learned that the investigation was criminal in nature in March 2013 (*id.* at ¶ 26). On these facts, Defendant's decision to bar Plaintiff from HPD-funded projects during the pendency of an investigation is rationally related to a legitimate government interest. In sum, Plaintiff has failed to plead sufficient facts that, taken as true, show that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Kusel*, 626 F.3d at 140 (citing *Neilson* v. *D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds by Appel* v. *Spiridon*, 531 F.3d 138 (2d Cir. 2008)). On these facts, its "class of one" claim cannot stand.

### ii.  The Criminal Investigation

The Court considers next whether Plaintiff's "class of one" claim based on Defendant's participation in criminal investigations into Plaintiff's alleged wage violations is barred by *Engquist* and concludes that it is. The decisionmaking applied by a prosecutor deciding which violations to investigate and what cases to bring is the type of "day-to-day" government discretion that a "class of one" claim cannot properly redress. *See Vested Bus. Brokers Ltd.* v. *Cty. of Suffolk*, No. 16 Civ. 4945 (JMA) (SIL), 2017 WL 4122616, at *7 (E.D.N.Y. Sept. 15, 2017) ("[T]o the extent that [plaintiff] is challenging [defendant's] investigation and subsequent decision not to make an arrest, the actions and decisions taken are discretionary, and not subject to a 'class of one' claim."); *Alfaro*, 2009 WL 2525128, at *9 ("[W]here a law is selectively enforced (without clear

standards for enforcement) against some people but not others, a class of one claim inappropriately interferes with the discretionary decision making process that a law enforcement officer or body must engage in."); *see also United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States* v. *Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (applying the *Engquist* bar to a case challenging prosecutorial discretion because "the discretion conferred on prosecutors in choosing whom and how to prosecute is flatly inconsistent with a presumption of uniform treatment").

While the Second Circuit clarified in *Kusel* that "*Engquist* does not bar all class-of-one claims involving discretionary state action," 626 F.3d at 142, it could not have been that Court's intention to hold that door ajar for a claim like Plaintiff's, which would grant a constitutional "class of one" claim to every target of a criminal investigation and every defendant in a criminal prosecution.  The day-to-day work of a prosecutor necessarily involves the selection of certain individuals to investigate and charge — this is the very type of government discretion that the Supreme Court removed from equal protection review in *Engquist*.  Accordingly, the Court holds that Plaintiff's claim that Defendant placed it in a "class of one" through participation in criminal investigations of it is barred under *Engquist*, and the Court will not consider the merits of this claim.

### b.   Claims Based on a Selective Enforcement Theory

Alternatively, Plaintiff complains that Defendant's *de facto* debarment of Plaintiff from HPD-funded projects and criminal investigation of Plaintiff effected equal protection violations on a theory of impermissible "selective enforcement." (SAC ¶¶ 33, 35, 70-74).  To plead a viable selective enforcement claim, Plaintiff must establish that "[i] compared with others similarly situated, [Plaintiff] was selectively treated; and [ii] that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." *LaTrieste Rest. & Cabaret, Inc.* v. *Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).  The Second Circuit has not settled the question of whether the degree of similarity required to prevail in a "selective enforcement claim" is less than that needed for a "class of one" claim, but, in any event, Plaintiff must at least show that Plaintiff and the Comparators are "similarly situated in all material respects." *Mosdos Chofetz Chaim, Inc.* v. *Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 695-96 (S.D.N.Y. 2011) (discussing the varying standards applied and collecting cases).

The Court accepts as true that Plaintiff was treated differently than the Comparators, insofar as Plaintiff was the only one of the group to be denied HPD-funded contracts and subjected to a criminal investigation.  (SAC ¶¶ 36-64).  But the Court need not accept as true Plaintiff's legal conclusions that it was similarly situated to the Comparators or that Defendant acted out of malice.  *See Iqbal*, 556 U.S. at 678.  Defendant argues that Plaintiff has not

pleaded sufficient facts to show that it is similarly situated to the Comparators. (Def. Br. 13 ("[T]he SAC is silent regarding whether the purported [C]omparators were on Enhanced Review status at the time that HPD approved them to work on projects; when, if ever, they were removed from Enhanced Review; and if so, under what conditions.")). Plaintiff weakly responds that it cannot substantiate this claim until it receives discovery from Defendant. (Pl. Opp. 7, 16). Even assuming that, with the benefit of discovery, Plaintiff could show the required degree of similarity, its "selective enforcement" claim would still fail, as the SAC does not contain sufficient allegations that Defendant acted with a malicious intent to injure.

The crux of Plaintiff's claim is that Defendant had an "axe to grind" with Plaintiff following the UBC's "smear campaign" (SAC ¶¶ 13-14), resulting in Defendant vindictively barring Plaintiff from HPD-funded contracts and putting Plaintiff through a criminal investigation (Pl. Opp. 16-19). Plaintiff contends that this vindictive singling-out "evidences irrationality and demonstrates bad faith or malice." (*Id.* at 19). But in so arguing, Plaintiff conflates the two-prong test for "selective enforcement." Plaintiff must show that it was treated differently than those similarly situated *and* that the different treatment was due to a malicious purpose. *LaTrieste Rest. & Cabaret, Inc.*, 40 F.3d at 590. Plaintiff would have this Court find that different treatment is itself proof of a malicious purpose. It is not.

There is nothing in the SAC, save Plaintiff's conclusory assertion that Defendant harbored a grudge because of the UBC's campaign, to support a

finding that Defendant barred plaintiff from HPD projects or investigated Plaintiff with a malicious intent. Plaintiff's unsupported allegation does not "nudge[] [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. What is more, the Court finds compelling Defendant's argument that a plausible, non-discriminatory reason for Defendant's decision to deny Plaintiff work on HPD-funded projects is readily apparent — namely, that Plaintiff, unlike the Comparators, was being investigated for possible criminal violations. And for the reasons stated above with respect to Plaintiff's "class of one" claim, the Court will not second-guess the discretion of the DOI and the prosecutors' offices that investigated Plaintiff under a "selective enforcement" theory without any suggestion in the pleadings of bad faith.

As set forth above, Plaintiff has not adequately pleaded any underlying constitutional violations under § 1983. Accordingly, the Court need not reach the question of whether Plaintiff's allegations establish municipal liability under *Monell*. *See Segal* v. *City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2000) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      November 28, 2017
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge